UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, L.L.C.                 Case No.
f/d/b/a/ LIVING ESSENTIALS,                 Hon.

      Plaintiff,

v.

NUTRITION SCIENCE LABORATORIES,
      LLC, a Texas Limited liability Company a/k/a
      Lily of the Desert, Lily of the Desert Nutrition,
      Lily of the Desert Nutraceuticals, L.O.D.C.
      Group, Ltd. and L.O.D.C., Inc.;
L.O.D.C. Group, Ltd., a Texas partnership d/b/a Nutrition
      Science Laboratories, LLC, L.O.D.C., Inc., Lily
      of the Desert, Lily of the Desert Nutrition,
      and Lily of the Desert Nutraceuticals; and
L.O.D.C., Inc., a Texas Corporation d/b/a Nutrition
      Science Laboratories, LLC, L.O.D.C. Group, Ltd.,
      Lily of the Desert, Lily of the Desert Nutrition,
      and Lily of the Desert Nutraceuticals

      Defendants.

_____

There is a related case pending in this jurisdiction, *Innovation Ventures, L.L.C., f/d/b/a Living Essentials v. Custom Nutrition Laboratories, LLC, Nutrition Science Laboratories, LLC and Alan Jones*; Case No. 2:12-cv-13850; Hon. Terrence G. Berg.

## **COMPLAINT**

Plaintiff, Innovation Ventures, LLC f/d/b/a Living Essentials ("Living Essentials"), by its attorneys, for its Complaint against Defendants, a) Nutrition

Science Laboratories, LLC, a/k/a Lily of the Desert ("NSL"), d/b/a Lily of the Desert Nutrition, Lily of the Desert Nutraceuticals, L.O.D.C., Group, Ltd., and L.O.D. C., Inc. b) L.O.D.C. Group, Ltd., d/b/a Nutrition Science Laboratories, LLC, L.O.D.C., Inc., Lily of the Desert, Lily of the Desert Nutrition, and Lily of the Desert Nutraceuticals, and c) L.O.D.C., Inc., d/b/a L.O.D.C. Group, Ltd., d/b/a Nutrition Science Laboratories, LLC, L.O.D.C. Group, Ltd., Lily of the Desert, Lily of the Desert Nutrition, and Lily of the Desert Nutraceuticals states as follows:

## Introduction

During the course of discovery in the matter of *Innovation Ventures, L.L.C., f/d/b/a Living Essentials v. Custom Nutrition Laboratories, LLC, Nutrition Science Laboratories, LLC and Alan Jones*; Case No. 2:12-cv-13850; Hon. Terrence G. Berg ("Case No. 12-13850"), Plaintiff discovered facts demonstrating liability by L.O.D.C. Group, Ltd., ("LD Operating") and L.O.D.C., Inc. ("LD Inc."). LD Operating and LD Inc. are either alter egos of Nutrition Science Laboratories, LLC ("NSL"), an existing defendant in Case No. 12-13850, or separate entities. Plaintiff moved for leave to amend its complaint in Case No. 12-13850 to add LD Operating and LD Inc. as defendants and to allege the factual support for its claims against them. Plaintiff sought to amend its complaint in Case No. 12-13850 as a more efficient alternative to filing a separate action and then moving to consolidate the two actions. This reasoning was relayed to the Court at a status conference in Case No. 12-13850. (See

Dkt. 226, Transcript of Telephone Status Conference, November 9, 2015 at pp. 9) The Court in Case No. 12-13850 denied the motion to amend. Plaintiff files this action to preserve and protect Plaintiff's claims against LD Operating and LD Inc., in the event they are not alter egos of NSL. Plaintiff has named NSL in this action to include all of the alter egos that it is aware of at this time but it reserves the right to seek redress against alter egos of NSL as part of Case No. 12-13850, in the event that it prevails against NSL in Case No. 12-13850.

In Case No. 12-13850, the Court recently entered an order relating to claims made in Plaintiff's Second Amended Complaint. See Dkt. 219, Opinion and Order Granting in Part and Denying in Part Nutrition Science's Motion for Summary Judgment and Denying Jones's Motion for Summary Judgment (Dkt. 199)(dated September 28, 2015) (the "9/28/15 Order"). Due to the nature of the claims – that L.O.D.C. Group, Ltd. and L.O.D.C., Inc. are alter egos with NSL and thus are liable along with NSL for the claims against NSL – Plaintiff has pled allegations in this Complaint that are included in Case No. 12-13850 and which were or may have been addressed in the 9/28/15 Order. Plaintiff includes these allegations because there is no final order in Case No. 12-13850 and to preserve Plaintiff's right to appeal the 9/28/15 Order and any effects the 9/28/15 Order may have in this case.

## Jurisdiction and Venue

1.      Plaintiff Living Essentials is a Michigan limited liability company with its principal place of business located in Farmington Hills, Michigan.

2.      NSL is a Texas limited liability company with its principal place of business located at 1887 Geesling Rd., Denton, TX, 76208.

3.      Based upon admissions from NSL and Alan Jones and information discovered in the pending matter *Innovation Ventures, L.L.C., f/d/b/a Living Essentials v. Custom Nutrition Laboratories, LLC, Nutrition Science Laboratories, LLC and Alan Jones*; Case No. 2:12-cv-13850; Hon. Terrence G. Berg, NSL is a division of L.O.D.C. Group, Ltd. and is not a separate and distinct legal entity.

4.      Plaintiff alleges that NSL and L.O.D.C. Group, Ltd. are alter egos. Therefore all references to NSL also encompass L.O.D.C. Group, Ltd. as its alter ego. At times, for purposes of clarity, Plaintiff includes allegations that NSL and L.O.D.C. Group, Ltd. are alter egos.  These clarifications do not negate that all references to NSL encompass L.O.D.C. Group, Ltd. but merely attempts to make clear as to those particular allegations that Plaintiff is alleging that they are alter egos.

5.      Plaintiff also alleges claims herein against L.O.D.C. Group, Ltd. in the alternative, in the event L.O.D.C. Group, Ltd. is determined not to be an alter ego of NSL but is determined to be a separate legal entity.

6.      L.O.D.C. Group, Ltd. has conducted business as Lily of the Desert.

4

7.     L.O.D.C. Group, Ltd. has conducted business as Lily of the Desert Nutrition.

8.     L.O.D.C. Group, Ltd. has conducted business as Lily of the Desert Nutraceuticals.

9.     L.O.D.C. Group, Ltd. has conducted business as Nutrition Science Laboratories, LLC.

10.     Defendant L.O.D.C. Group, Ltd. ("LD Operating") is a Texas partnership.  Its partners are L.O.D.C., Inc., a Texas Corporation, E. Don Lovelace, an individual domiciled in Texas, Dillon Lovelace, an individual domiciled in Texas, and Patty Lovelace, an individual domiciled in Texas.

11.     Defendant L.O.D.C., Inc. ("LD Inc.") is a Texas Corporation with its principal place of business located at 1887 Geesling Rd., Denton, TX, 76208.

12.     Upon information and belief, LD Inc. is the alter ego of LD Operating.

13.      Plaintiff alleges that LD Operating and LD Inc. are alter egos.  Therefore all references to LD Operating also encompass LD Inc. as its alter ego.  At times, for purposes of clarity, Plaintiff includes allegations that LD Operating and LD Inc. are alter egos.  These clarifications do not negate that all references to LD Operating encompass LD Inc. but merely attempts to make clear as to those particular allegations that Plaintiff is alleging that they are alter egos.

14.    Plaintiff also alleges claims herein against LD Inc. in the alternative, in the event LD Inc. is determined not to be an alter ego of LD Operating or NSL but is determined to be a separate legal entity.

15.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.  The parties are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b).

17.    Personal jurisdiction is proper in the State of Michigan pursuant to MCL §§ 600.701(3), 600.705, 600.711(2), and 600.715.

18.    Personal jurisdiction and venue have been adjudicated as to Defendant NSL in Case No. 12-13850.  There, the Court has ruled that it has personal jurisdiction over Defendants CNL, NSL, and Jones in its "Opinion and Order Denying Defendant's Renewed Motion to Dismiss (Dkt. 78)" [Dkt. 110].  Further, The Court has ruled that venue is proper in this District as to NSL, in its "Opinion and Order Denying Defendant's Renewed Motion to Dismiss (Dkt. 78)" [Dkt. 110].

19.    NSL is a successor, assign or the purchaser of substantially all of the assets of Custom Nutrition Laboratories, LLC, and is therefore bound by the terms of a contract known as the Confidential Settlement and Release Agreement (the "Agreement"), including its consent to jurisdiction and venue, pursuant to §§16 and

25.  (A copy of the redacted Agreement is attached hereto as **Exhibit A**. at §§16 and 25.)

20.     NSL is otherwise bound by the terms of the Agreement, in full or in part, including, but not limited to, through its incorporation of the Agreement or portions of the agreement, such as but not limited to, §5(c) of the Agreement, by reference into an Asset Purchase Agreement between CNL and NSL.

21.     Notwithstanding the terms of the Agreement, NSL further is subject to this Court's jurisdiction because NSL carries on a continuous and systematic part of its business within the State of Michigan, and also transacts business within the State of Michigan out of which this lawsuit arises.  Specifically, NSL manufactures, or manufactured during the relevant time period, energy shots and Energy Liquids, as defined below, that are sold or distributed to national retailers for resale in the retailers' outlets in the State of Michigan.

22.     LD Operating is best known for being an integrated grower, processor, and manufacturer of aloe vera based products.  However, it also sells dietary supplement products including energy shots or Energy Liquids.

23.     Documents obtained in discovery in Case No. 12-13850 revealed that NSL is a division of LD Operating, specifically the "nutrition" division of LD Operating.

24. LD Operating and LD Inc. are subject to this Court's jurisdiction because they carry on a continuous and systematic part of their business within the State of Michigan. Specifically, LD Operating and LD Inc. manufacture, sell, and distribute dietary supplement and other products in the State of Michigan, such as Lily of the Desert brand aloe vera juice, gel, gelly, supplements, and lotion products, among others, in this State and in this judicial district.

25. LD Operating and LD Inc. are subject to this Court's jurisdiction because they carry on a continuous and systematic part of their business within the State of Michigan, and also transact business within the State of Michigan out of which this lawsuit arises. Specifically, LD Operating and LD manufacture, sell, and distribute energy shots and Energy Liquids, as defined below, that are sold or distributed to national retailers for resale in the retailers' outlets in the State of Michigan.

26. Plaintiff's description of the Defendants' corporate structure and relationship to each other is based upon its information and belief and information obtained in Case No. 12-13850. Plaintiff hereby puts Defendants on notice that it is its intent to name any and all corporate entities and individuals that have helped or acted in concert with Alan Jones, NSL, LD Operating, LD Inc. and/or CNL to breach their contractual obligations to Living Essentials or otherwise interfere with Living Essentials' Agreement with CNL, NSL and Alan Jones.

## General Allegations

### *Plaintiff Living Essentials*

27.     Living Essentials is the manufacturer, marketer and distributor of the 5-hour ENERGY® liquid dietary supplement.  Living Essentials distributes 5-hour ENERGY® throughout the United States.

28.     Living Essentials has invested a great deal of time, effort, and money to create an effective product.  In great part, as a result of creating an effective formula for 5-hour ENERGY®, Living Essentials has created and maintains goodwill with consumers and its retailers/customers.

### *Living Essentials' Previous Dispute and Settlement with CNL*

29.     Living Essentials contracted with CNL in 2004 to manufacture and package 5-hour ENERGY®.  At that time, Defendant Jones was the CEO of CNL.

30.     As part of the contract between Living Essentials and CNL, CNL was privy to specific information concerning the formula used to manufacture 5-hour ENERGY®.

31.     In October 2007, the contract between Living Essentials and CNL was terminated.  At that time a dispute arose between the parties.

32.     A case was filed in Texas state court styled *Custom Nutrition Laboratories, LLC v. Innovation Ventures, LLC et. al*., Case No. CC-07-14515-E; and a case was filed in the United States District Court for the Eastern District of Texas,

styled *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC et. al.*, Civil Action No.

4:08-CV-232 (together, both lawsuits are referred to as the "Texas Litigation").

33.     On or about August 17, 2009, Living Essentials, CNL, Jones personally,

and other parties to the Texas Litigation resolved their dispute and executed the

Agreement, which identified the parties' various rights and responsibilities under the

Agreement.  (*See* **Exhibit A**.)

34.     To protect Living Essentials' goodwill, described above, it was material

to Living Essentials that the Agreement include a restriction that Defendants agree,

amongst other things, not to manufacture or distribute Energy Liquids containing

certain Prohibited Ingredients (capitalized terms are defined in the Agreement),

discussed below.  Defendants breached that material provision and as a result, Living

Essentials has been damaged.

35.     The Agreement includes, among other things, the following agreements:

a.     The CNL Parties, as defined in the Agreement, including but not limited

       to CNL, Jones,  their successors or assigns,  and any entity wherein any

       of the CNL Parties manage, control, or invest in, individually,

       collectively, or in concert with others,  are prohibited from, directly or

       indirectly, manufacturing, formulating, assisting in the formulation,

       distributing, warehousing, storing, shipping, advertising, marketing,

       promoting, transferring, bartering, trading, donating, giving away, selling

or offering to sell (collectively referred to herein as "Producing" or any form of this verb which verb is capitalized) any Energy Liquid (as defined in the Agreement) that contains certain specified ingredients in all forms, and their derivatives, constituents, and synthetic equivalents or substitutes (the "Prohibited Ingredients"). The duration of this restriction is the same period of time a patent would provide protection to Living Essentials. (**Exhibit A** at §5.c.i.)

b.   The restrictive covenants "are valid and reasonable in any and all respects (including, but not limited to, duration, scope, geographical area and any other factor) and the definitions used or referred to herein were negotiated with the assistance of counsel and are unambiguous and clearly understood by the Parties." (**Exhibit A** at §5.a.i.)

c.   The restrictive covenants "were negotiated by and between the Parties with the advice of counsel." (**Exhibit A** at §5.a.ii.)

d.   The restrictive covenants "were and are, under any and all circumstances, valid and fully enforceable and binding on the CNL Parties and any of their successors and/or assigns." (**Exhibit A** at §5.a.iii.)

e.   That "no assignment of any rights, obligations or benefits shall affect such restrictive covenants against the CNL Parties or any successors

and/or assigns, and the CNL Parties affirmatively waive any objection to enforceability of such restrictive covenants against them as a result of any such assignment." (**Exhibit A** at §5.a.iv.)

f.   That "none of the CNL Parties or any of their successors or assigns shall ever challenge the enforceability or applicability of [the restrictive covenants]." (**Exhibit A** at §5.a.vi.)

g.   That "none of these restrictive covenants violate or run afoul of any law, statute or public policy." (**Exhibit A** at §5.a.vii.)

h.   That "only the laws of the State of Michigan (without regard to conflicts of law principles) shall govern the construction, validity, enforceability, and applicability of [the restrictive covenants]; (**Exhibit A** at §5.a.viii.)

i.   That "any litigation related to [the restrictive covenants] shall be heard and decided exclusively in the Michigan courts set forth in Section 25 of this Agreement." (**Exhibit A** at §5.a.ix.)

j.   That "each of the restrictive covenants applies worldwide, which is a reasonable geographic territory that was specifically negotiated and reflects the amount of consideration paid, the compromises among the Parties, and a reduction in the breadth and scope of the product covered and the current markets and planned multi-national markets of the LE Parties." (**Exhibit A** at §5.a.xi.)

### *NSL's Assumption of CNL's Obligations*

36.     NSL is bound to the Agreement, including the provisions cited in the previous paragraph and its subparagraphs, as successor to CNL, an assign of CNL, as purchaser of substantially all of the assets of CNL, or as an entity acting in concert with one or more of the CNL Parties including CNL or Jones.

37.     The Agreement also identified certain Existing Products that CNL was permitted to continue manufacturing subject to the provisions of the Agreement cited in paragraph 22, above.  Two of these products are "Rock On" and Slam.  (**Exhibit A** at §5.c.ii. and at Exhibit D thereto.)

38.     Within weeks of the execution of the Agreement, on September 23, 2009, Defendant NSL was organized within the State of Texas.

39.     NSL was organized for the purpose of acquiring the assets and liabilities of CNL.

40.     On or about October 14, 2009 NSL, CNL, and Jones, among others, entered into an Asset Purchase Agreement ("APA").  The Asset Purchase Agreement is in the possession of Defendants.

41.     Pursuant to the APA, NSL acquired the assets and most liabilities of CNL.

42.     NSL began individually, collectively, or in concert with one or more of them, directly or indirectly, Producing, certain CNL products, including Rock On and

Slam.  Upon information and belief, these efforts were conducted at CNL's facility using CNL's equipment, both of which were acquired by NSL.

43.    Specifically, NSL was, at least, formulating, manufacturing, distributing, and selling certain CNL products, including Rock On and Slam.  Upon information and belief, these efforts were conducted at CNL's facility using CNL's equipment, both of which were acquired by NSL.

44.    NSL was aware of the Agreement at the time it executed the APA.

45.    The Agreement is identified in the APA.

46.    Specifically, the APA provides that NSL was obtaining certain of CNL's assets subject to the Agreement and specifically notifies NSL that:  "the formula for energy drinks manufactured by Sellers and certain related trademark and copyright matters are limited by the settlement agreement between Seller and Living Essentials and the related consent judgments contained in Schedule 4.2(h)."  (APA at §4.2(r).)

47.    This language was included in the APA specifically to notify NSL of the Agreement and its terms, and of NSL's corresponding obligation to protect Living Essentials' rights in the Agreement.

48.    Section 16 of the Agreement provides:

Successors and Assigns.  On or after the date of this Agreement, neither the CNL Parties nor the UL Parties shall make any assignment of any terms, covenants, conditions, provisions and benefits of the Agreement (the reference to "assigns" elsewhere in the Agreement shall not affect, alter or modify the foregoing prohibition on assignments).  **Except as provided in the preceding sentence, the terms, covenants, conditions,**

**provisions and benefits of this Agreement shall be binding upon and inure to the benefit of the Parties, their respective successors and the LE Parties' assigns, and anyone claiming by or through any one or more of them, including, without limitations, any person or entity that acquires substantially all of the their assets.** The provisions hereof shall survive any merger, acquisition, restructuring and/or reorganization, and the surviving entity shall be fully bound hereby. (**Exhibit A** at §16; emphasis added.)

49.     NSL has acquired substantially all of the assets of CNL pursuant to the APA, was aware of the Agreement at the time the APA was executed, and acquired CNL's assets subject to the Agreement.

50.     NSL has acted in concert with Jones with respect to violations of the Agreement as alleged herein.

51.     To the extent NSL, LD Operating, and LD Inc. are separate entities, LD Operating and LD Inc. have acted in concert with each other and with one or more other person or entity, with respect to NSL and Jones' violations of the Agreement as alleged herein.

52.     NSL has acted in concert with one or more of the CNL Parties and with one or more other person or entity with respect to violations of the Agreement as alleged herein.

53.     To the extent NSL, LD Operating, and LD Inc. are separate entities, LD Operating and LD Inc. have acted in concert with each other and with one or more other person or entity, with respect to NSL and Jones' violations of the Agreement as alleged herein.

### Breach of the Settlement Agreement

54.     Despite the prohibitions in the Agreement, CNL, NSL, LD Operating, LD Inc., and Jones have individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced Energy Liquids that contain choline bitartrate and choline citrate, which are expressly listed Prohibited Ingredients under §5.i.c. of the Agreement.

55.     Specifically, CNL, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, were, at least, formulating, manufacturing, distributing, and selling Energy Liquids that contain choline bitartrate and choline citrate, which are expressly listed Prohibited Ingredients under §5.c.i. of the Agreement.

56.     Despite the prohibitions in the Agreement, NSL, LD Operating, LD Inc., and Jones have continued to Produce Energy Liquids that contain betaine.

57.     Specifically, CNL, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, were, at least, formulating, manufacturing, distributing, and selling Energy Liquids that contain betaine.

58.     Betaine is a derivative of choline.

59.     NSL has admitted that betaine is a derivative of choline.

60.     Jones has admitted that betaine is a derivative of choline.

61.   Choline is also known as bilineurine, Beta-hyroxyethyl trimethylammonium hydroxide, lipotropic factor, and trimethylethanolamine.

62.   Betaine is a derivative of choline containing items, including but not limited to, citicoline, choline bitartrate, choline chloride, choline citrate, cytidine 5-diphosphocholine (CDP-choline), intrachol, PhosCholxAE, phosphatidylcholine, TRI, and tricholine citrate (TRI) ("choline-containing items").

63.   As a derivative of choline, betaine is a Prohibited Ingredient.

64.   As a derivative of choline containing items, betaine is a Prohibited Ingredient.

65.   Betaine is an equivalent to choline, citicoline, choline bitartrate, bilineurine, Beta-hyroxyethyl trimethylammonium hydroxide, choline chloride, choline citrate, cytidine 5-diphosphocholine (CDP-choline), intrachol, lipotropic factor, PhosCholxAE, phosphatidylcholine,  TRI, tricholine citrate (TRI), and trimethylethanolamine (hereinafter this list of items is referred to as the "Expressly Listed Ingredients") for purposes of methyl group donation.

66.   As an equivalent to the Expressly Listed Ingredients, betaine is a Prohibited Ingredient.

67.   Betaine is a substitute for the Expressly Listed Ingredients for purposes of methyl group donation.

68.     As a substitute for the Expressly Listed Ingredients, betaine is a Prohibited Ingredient.

69.     Despite the prohibitions in the Agreement, NSL, LD Operating, LD Inc. and Jones have continued to individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produce Energy Liquids that contain alpha glycerylphosphorylcholine.

70.     Specifically, NSL, LD Operating, LD Inc. and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, were, at least, formulating, manufacturing, distributing, and selling Energy Liquids that contain alpha glycerylphosphorylcholine.

71.     Alpha glycerylphosphorylcholine is a derivative of phosphatidylcholine.

72.     Alpha glycerylphosphorylcholine is a constituent of phosphatidylcholine.

73.     Alpha glycerylphosphorylcholine is a derivative of the Expressly Listed Ingredients.

74.     Alpha glycerylphosphorylcholine is a constituent of the Expressly Listed Ingredients.

75.     Alpha glycerylphosphorylcholine is a form of choline.

76.     As a derivative of phosphatidylcholine, alpha glycerylphosphorylcholine is a Prohibited Ingredient.

77.     As a derivative of the Expressly Listed Ingredients, alpha glycerylphosphorylcholine is a Prohibited Ingredient.

78.     As a constituent of phosphatidylcholine, alpha glycerylphosphorylcholine is a Prohibited Ingredient.

79.     As a constituent of the Expressly Listed Ingredients, alpha glycerylphosphorylcholine is a Prohibited Ingredient.

80.     As a form of choline, alpha glycerylphosphorylcholine is a Prohibited Ingredient.

81.     As a form of choline, alpha glycerylphosphorylcholine is equivalent to choline.

82.     As a form of choline, alpha glycerylphosphorylcholine is a substitute for choline.

83.     Betaine is trimethylglycine.

84.     On information and belief, NSL, LD Operating, LD Inc. and Jones have continued to individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produce Energy Liquids that contain other Prohibited Ingredients in violation of §5.c.i. of the Agreement.

85.     After August 17, 2009, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced The Energy Shot.

86.    The Energy Shot contains betaine.

87.    After August 17, 2009, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced Rock On.

88.    After August 17, 2009, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced Slam.

89.    After August 17, 2009, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced NXT Energy.

90.    After August 17, 2009, NSL, LD Operating, LD Inc., and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced products that were identified in discovery in Case No. 12-13850 but which were designated as Highly Confidential – Attorneys' Eyes Only information by NSL,  Jones, and a non-party who responded to a subpoena.  These other products are identified in documents produced in Case No. 12-13850 and bates numbered by NSL and Jones as NSL 20, 21, 22, 23, 24, 27, 28, 29, 30, 32 (these documents are incorporated by reference herein and Defendants are in possession of these documents); in depositions given by Alan Jones and David Henzler, also designated by NSL and Jones as Highly Confidential – Attorneys' Eyes Only, at the

following pages:   Jones Dep. Tr. at 70, 114 and Henzler Dep. Tr. at 18 (these documents are incorporated by reference herein and Defendants are in possession of these documents); and in documents produced by a non-party contained in Dkt. 211 at Exhibits 10 and 11 (these documents are incorporated by reference herein and Defendants are in possession of these documents).   For ease of reference, these products are referred to herein collectively as the "Secret Products".

91.     When manufactured by CNL, upon belief, Rock On did not contain betaine.

92.     Versions of Rock On Produced by NSL, LD Operating, LD Inc., or Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine.

93.     NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of Rock On, containing betaine, violated the Agreement.

94.     Versions of Rock On Produced by NSL (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained choline bitartrate and choline citrate.

95.    NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of Rock On, containing choline bitartrate and choline citrate, violated the Agreement.

96.    Versions of Slam Produced by NSL (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine.

97.    NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of Slam, containing betaine, violated the Agreement.

98.    Versions of NXT Energy Produced by NSL (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained choline citrate.

99.    NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of NXT Energy, containing choline citrate, violated the Agreement.

100.    Versions of the product identified in document NSL 20 Produced by NSL in Case No. 12-13850 (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained alpha glycerylphosphorylcholine.

101.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 20, containing alpha glycerylphosphorylcholine, violated the Agreement.

102.   Versions of the product identified in document NSL 21 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained alpha glycerylphosphorylcholine.

103.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 21, containing alpha glycerylphosphorylcholine, violated the Agreement.

104.   Versions of the product identified in document NSL 22 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained alpha glycerylphosphorylcholine.

105.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 22, containing alpha glycerylphosphorylcholine, violated the Agreement.

106.   Versions of the product identified in document NSL 23 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more of them, directly or indirectly, after August 17, 2009, contained betaine.

107.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 23, containing betaine, violated the Agreement.

108.   Versions of the product identified in document NSL 29 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine.

109.    NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 29, containing betaine, violated the Agreement.

110.   Versions of the product identified in document NSL 30 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine.

111.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 30, containing betaine, violated the Agreement.

112.   Versions of the product identified in document NSL 32 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine.

113.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 32, containing betaine, violated the Agreement.

114.   Versions of the product identified in Exhibits 10 and 11 to Dkt. 211 Produced by NSL (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine.

115.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in Exhibits 10 and 11 to Dkt. 211, containing betaine, violated the Agreement.

116.   Versions of the product identified in document NSL 27 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones

25

individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained trimethylglycine.

117.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 27, containing trimethylglycine, violated the Agreement.

118.   Versions of the product identified in document NSL 28 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained trimethylglycine.

119.   NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect, Production of the product identified in document NSL 28, containing trimethylglycine, violated the Agreement.

120.   Versions of the product identified in Jones Dep. Tr. at 70, 114, Henzler Dep. Tr. at 18, and INV 246-7 Produced by NSL in Case No. 12-13850  (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained trimethylglycine.

121. NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in Jones Dep. Tr. at 70, 114, Henzler Dep. Tr. at 18, and INV 246-7, containing trimethylglycine, violated the Agreement.

122. Versions of the product identified in document NSL 24 Produced by NSL in Case No. 12-13850 (including alter egos LD Operating and LD Inc.) and Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, after August 17, 2009, contained betaine hydrochloride.

123. NSL (including alter egos LD Operating and LD Inc.) and Jones' individual, collective, or concerted actions for the direct or indirect Production of the product identified in document NSL 24, containing betaine hydrochloride, violated the Agreement.

124. NSL's (including alter egos LD Operating and LD Inc.) individual, collective, or concerted actions for the direct or indirect Production of The Energy Shot, Rock On, Slam, NXT Energy, the Secret Products, and any other Energy Liquids that contain a Prohibited Ingredient, violates the Agreement.

### *Jones' and NSL's Connection to LD Operating, LD Inc., and Lily of the Desert*

125. According to Alan Jones' LinkedIn page, Jones was the President of the Nutrition Division of Lily of the Desert, a division of LD Operating and LD Inc., in

the period October 2009-January 2014. (**Exhibit B, Linked In pages from 2012 and 2014**.)

126. Jones was also the president of NSL. (**Exhibit C, VMP Nutrition Foundation pages from 2012 and 2014**.)

***Concealment of the Material Facts by Jones, NSL, and Defendants***

127. Defendants concealed that NSL, LD Operating and LD Inc. are alter egos.

128. In the event LD Operating and LD Inc. are not alter egos of NSL, Defendants concealed NSL's fraudulent transfer of assets to LD Operating and/or LD Inc. and Defendants concealed LD Operating and LD Inc.'s inducement of NSL and Jones to violate the Agreement as set forth herein.

129. Acts of concealment include but are not limited to those listed below.

130. In Case No. 12-13850, Defendants NSL and Jones refused to answer discovery and produce documents which would have revealed (a) the alter ego status of LD Operating and LD Inc.; (b) LD Operating and LD Inc.'s Production of the Energy Liquids previously Produced by NSL; and (c) the receipt of NSL's fraudulently transferred assets.

131. Defendants sought and obtained a protective order in Case No. 12-13850 against discovery to non-parties in an effort to stymie efforts to discover these facts. The protective order has been in place since mid-2013 and remains intact, although

the Court granted leave in January 2015 to permit Plaintiff an opportunity to subpoena documents from a limited number of non-parties.

132.  Defendants Jones and NSL (in the event it is not an alter ego of LD Operating and LD Inc.) falsely asserted in December 2014 and January 2015 in opposition to Plaintiff's efforts to obtain non-party discovery in Case No. 12-13850 that such discovery would harass NSL's customers even though, at the time, both Jones and NSL knew that NSL had already stopped operating in approximately April 2014, that Jones had left NSL in approximately January 2014, that NSL had no customers because it had ceased operations in about April 2014, and NSL had transferred its operations and customer accounts to LD Operating and/or LD Inc.

133.  Defendants Jones and NSL falsely asserted in December 2014 and January 2015 in opposition to Plaintiff's efforts to obtain non-party discovery in Case No. 12-13850  that NSL or Jones would produce the requested documents and information, including communications between and among NSL, Jones, LD Operating, and LD Inc.  NSL and Jones did not provide the promised discovery and asserted in discovery responses that certain communications did not exist although discovery from non-parties received by Plaintiff in 2015 demonstrate that such communications do exist.

134.  NSL has been obfuscating its ownership structure throughout Case No. 12-13850.  For example, in 2012 NSL filed an affidavit in that case that E. Don

Lovelace was 100% owner of NSL.  However, in 2015, NSL filed an affidavit in that case that was owned and had always been owned by E. Don Lovelace, Patty Lovelace and Dillon Lovelace.

135.   Defendants failed to supplement discovery responses that were no longer true or complete even after the passage of well more than 12 months' time.

136.   It was only after Plaintiff sought and obtained leave to pursue limited non-party discovery in 2015 in Case No. 12-13850 that the non-parties and LD Operating revealed that LD Operating and LD Inc. had been inducing NSL and Jones to Produce Energy Liquids in violation of the Agreement and alternatively, that NSL was a division of LD Operating and LD Inc.  Indeed, some information was not revealed until late May 2015 when Plaintiff received documents from a non-party in response to a subpoena for documents.

137.   Jones signed contracts as President of NSL and represented he was President of NSL.  See Case No. 12-13850, Dkt. 201 at Exhibit 4 and Dkt. 211 at Exhibits 11, 15, 16, 17, 19 and 21.

138.   According to NSL, it is a division of LD Operating and LD Inc.. See Case No. 12-13850 Dkt. 211 at Exhibit 25 (incorporated by reference herein and of which Defendants have possession).

139.   One principal of LD Operating and LD Inc. acknowledged that NSL was a division of LD Operating and LD Inc. and that LD Operating and LD Inc. essentially

closed NSL and transferred all of the NSL division assets and business to a LD Operating or LD Inc. division under the new name of Lily of the Desert Nutraceuticals.

140.   Employees working for LD Operating and LD Inc. and NSL used e-mails with the @teamnsl.com extension and included e-mail signatures identifying themselves variously as working for NSL and Lily of the Desert and sometimes both.

141.   In April 2014, the NSL division ceased operations and all NSL assets, including at least four of the accounts or agreements to produce the Secret Products, were transferred to LD Operating or LD Inc. and LD Operating began to produce and sell at least four of the Secret Products.

142.   Such transfer occurred without any agreement or consideration.

143.   There is no written agreement transferring this business from NSL to LD Operating or LD Inc.

144.   NSL, LD Operating, and LD Inc. had the same addresses:  2055 Luna Rd., Ste. 100, Carrollton, TX 75006 and 1887 Geesling Rd., Denton, TX 76208.

145.   Persons affiliated with LD Operating, LD Inc. and NSL used e-mail signature blocks and e-mail addresses reflecting affiliations with both NSL and Lily of the Desert.  For example see, Case No. 12-13850 Dkt. 211 at Ex. 28, marked as Highly Confidential – Attorneys' Eyes Only (this document is incorporated by reference herein and is in Defendants' possession).

146.   NSL and LD Operating and/or LD Inc. shared management personnel.

147.   NSL (including alter egos LD Operating and LD Inc.) and Jones manufactured, sold, or distributed The Energy Shot, Rock On, Slam, NXT Energy, the Secret Products and other Energy Liquids in violation of the Agreement.

148.   NSL (including alter egos LD Operating and LD Inc.) individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced Energy Liquids, including but not limited to Rock On, The Energy Shot, Slam, NXT Energy, and the Secret Products for purchase by consumers in Michigan and, on information and belief, has done so at all times material hereto.

149.   Jones individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced Energy Liquids, including but not limited to Rock On, The Energy Shot, Slam, NXT Energy, and the Secret Products for purchase by consumers in Michigan and, on information and belief, has done so at all times material hereto.

150.   CNL, Jones, and NSL, have conspired with LD Operating (to the extent it is a separate entity), LD Inc. (to the extent it is a separate entity), E. Don Lovelace, and others and acted in concert with one or more person or entity to commit the acts and omissions alleged herein.

151.   Additionally, Jones has held himself out on his LinkedIn page as the "inventor and creator of the 2 oz. energy shot supplement category.  5 Hour Energy

32

was our signature creation in 2004 . . . ." in violation of Sections 2, 5.e.i, and/or other provisions of the Agreement.  (**Exhibit B**.)

152.   Additionally, Jones is now the Chief Executive Offer of a new Texas limited liability company, Universal Nutrients LLC, which was formed on January 9, 2014 and which is located in Fort Worth, Texas.

153.   In violation of Sections 2, 5.e.i, and/or other provisions of the Agreement, Jones, on his biographical page on Universal Nutrients' website, seeks to trade on his connection to 5-hour ENERGY® and imply that he was its creator by stating that: "His desire to have a deep understanding of individual nutrients and their potential benefits to the human body have led to the development of more than 2,000 formulas over his 23-year career as a product formulator and manufacturer. His formulas combined have generated revenues for his customers of more than $8 billion USD …. At an industry tradeshow Jones met Tom Morris, then president of a small marketing company called Living Essentials which was marketing a hangover prevention product. It was Alan's proposal to Tom that LE come out with a morning-after energy shot to complement its hangover product that led to the creation of what today is known as 5 Hour Energy. 5 Hour Energy soon became the dominant leader in the newly-developed energy shot category and currently has annual sales of well over $1.3 billion USD."  (*See* **Exhibit D.**)

154.   Upon information and belief, discovery may establish that Defendants have engaged in other conduct that violates the Agreement or which is encompassed within the claims contained in this Complaint.

155.   While Plaintiff previously suspected LD Operating and/or LD Inc. (to the extent they are separate entities from each other and/or from NSL) to be implicated in events giving rise to Plaintiff's causes of action in Case No. 12-13850, NSL and Jones frustrated Plaintiff's efforts in discovery to ascertain information sufficient to formally add LD Operating and/or LD Inc., in good faith, as parties.  However, in 2015, Plaintiff discovered evidence of the interrelationship among Jones, NSL, and Lily of the Desert – much of it via third-party subpoena responses received in late May 2015. As alleged herein, NSL and Jones' inaccurate representations in pleadings and discovery responses, and incomplete document production prevented Plaintiff from discovering such new evidence prior to that time.  Having discovered such new evidence, Plaintiff sought from the Court, and the Court ultimately granted, permission to file a Motion for Leave to File a Third Amended Complaint in October 2015 (per the Court's standing order, all motions required Court permission prior to filing).  Plaintiff filed that Motion in November 2015.

156.   Based upon the discovery rule, any applicable statutes of limitation affecting or which might affect Plaintiff's causes of action have been extended, postponed, or tolled, or the accrual of Plaintiff's causes of action has been deferred

until Plaintiff knew or exercising reasonable diligence, should have known of the facts giving rise to the causes of action.

157.   Plaintiff's injuries are objectively verifiable.

158.   The nature of Plaintiff's injuries were inherently undiscoverable until the events set forth herein.

159.   Defendant NSL (including alter egos LD Operating and LD, Inc.) had a duty to disclose their true relationship and the concealed facts, as identified herein, including, but not limited to, fully and accurately responding to discovery requests in Case No. 12-13850.

160.   Defendants actually knew that that they had committed a wrong(s) against Plaintiff.

161.   Defendants had a fixed purpose to conceal the wrong(s) and to prevent inquiry or escape investigation and to mislead or hinder acquirement of information disclosing a right of action.

162.   Defendants did conceal the wrong(s).

163.   Defendants' acts, as set forth herein, constitute fraudulent concealment of Plaintiff's causes of action which has extended, postponed, or tolled the applicable statutes of limitation affecting Plaintiff's causes of action.

## Count I –Breach of Contract
## (Breach of Covenant Not to Use Prohibited Ingredients)

164.   Living Essentials incorporates by reference all of the preceding paragraphs.

165.   The Agreement is a valid and binding contract between Living Essentials and CNL, Jones, and NSL (including alter egos LD Operating and LD Inc.).

166.   NSL incorporated the Agreement by reference into the APA.

167.   At times during the period August 17, 2009 through the present, CNL, Jones, and NSL (including alter egos LD Operating and LD Inc.) have breached the restrictive covenants found in the Agreement by individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced products– including but not limited to, The Energy Shot, Rock On, Slam, NXT Energy, and the Secret Products – which contain a Prohibited Ingredient.

168.   Discovery may establish that CNL, Jones, and NSL (including alter egos LD Operating and LD Inc.) have breached the Agreement by using other Prohibited Ingredients in other Energy Liquids.

169.   Discovery may establish that CNL, Jones, and NSL (including alter egos LD Operating and LD Inc.) have breached the Agreement by other methods as well.

170.   As a result of CNL, Jones, and NSL's (including alter egos LD Operating and LD Inc.) breaches of the Agreement, Living Essentials has suffered irreparable

and other injury, and there is immediate and imminent danger that Living Essentials will continue to suffer irreparable injury for which there is no adequate remedy at law.

171.   Living Essentials is entitled to temporary, preliminary, and permanent injunctive relief against further breaches of the Agreement.  Further, Living Essentials has suffered damages in excess of $75,000.00 as a direct result of these breaches which include, but are not limited to, lost profits and attorneys' fees.

## Count II – Other Breaches of the Contract by NSL (including alter egos LD Operating and LD Inc.)

172.   Living Essentials incorporates by reference all of the preceding paragraphs.

173.   NSL incorporated the Agreement by reference into the APA.

174.   NSL (including alter egos LD Operating and LD Inc.) e also violated §5.a.i., iii, iv, vi, vii, and ix of the Agreement by improperly: (1) challenging the validity and reasonableness of the restrictive covenants and by maintaining that the restrictive covenants are ambiguous (**Exhibit A** at § 5.a.i.); (2) maintaining that the restrictive covenants are not valid, fully enforceable, binding on, and/or applicable to the CNL Parties (including Jones) and any of their successors and/or assigns (including NSL) (**Exhibit A** at §5.a.iii., iv and vi); (3) challenging the restrictive covenants on the grounds that they run afoul of any law, statute or public policy (**Exhibit A** at §5.a.vii.); and (4) challenging the jurisdiction of this Court to hear and decide Case No. 12-13850 (**Exhibit A** at §5.a.ix.).

175.    Defendants and any person or entity acting with them, violated §15 by failing to deliver all documents, materials and the like in all forms related to the Texas Litigation or the former business relationship between CNL and LE and by retaining copies, summaries, excerpts, extracts or notes of these items.

176.    As a result of Defendants' breaches of the Agreement, Living Essentials has suffered irreparable injury, and there is immediate and imminent danger that Living Essentials will continue to suffer irreparable injury for which there is no adequate remedy at law.

177.    Living Essentials is entitled to temporary, preliminary, and permanent injunctive relief against further breaches of the Agreement.  Further, Living Essentials has suffered damages in excess of $75,000.00 as a direct result of these breaches which include, but are not limited to, lost profits and attorneys' fees.

### Count III – Breach of Contract by NSL (including alter egos LD Operating and LD Inc.)

178.    Living Essentials incorporates by reference all of the preceding paragraphs.

179.    The Agreement is a valid and binding contract between Living Essentials and NSL (including alter egos LD Operating and LD Inc.).

180.    NSL incorporated the Agreement by reference into the APA.

181.    NSL (including alter egos LD Operating and LD Inc.) has breached §5.e.i. of the Agreement by including or permitting to be included references to 5-hour

ENERGY® on its labeling of certain energy drinks.  In support of this allegation, Plaintiff relies upon documents produced in discovery by Jones and NSL at bates number documents NSL 23 and NSL 30 (these documents are incorporated by reference herein and Defendants are in possession of these documents).

182.   On information and belief, discovery may establish additional violations of §5.e.i. of the Agreement.

183.   As a result of Defendants' breaches of the Agreement, Living Essentials has suffered irreparable injury, and there is immediate and imminent danger that Living Essentials will continue to suffer irreparable injury for which there is no adequate remedy at law.

184.   Living Essentials is entitled to temporary, preliminary, and permanent injunctive relief against further breaches of the Agreement.  Further, Living Essentials has suffered damages in excess of $75,000.00 as a direct result of these breaches which include, but are not limited to, lost profits and attorneys' fees.

## Count IV – Breach of Contract by NSL (including alter egos LD Operating and LD Inc.) (Third Party Beneficiary)

185.   Living Essentials incorporates by reference all of the preceding paragraphs.

186.   In the alternative, if NSL (including alter egos LD Operating and LD Inc.) is found to not be a successor, assign or an entity that has purchased substantially all of the assets of CNL, or otherwise not a party to the Agreement, NSL still is liable

to Living Essentials for its breach of the APA, of which Living Essentials is a third-party beneficiary.

187.   Living Essentials was an intended third-party beneficiary of the APA, as evidenced by specific references to the Agreement in the APA, and because of the Agreement's control over certain of CNL's assets acquired by NSL (including alter egos LD Operating and LD Inc.).

188.   NSL (including alter egos LD Operating and LD Inc.) knew and specifically acknowledged that it was acquiring assets that were restricted by and obtained subject to the Agreement, and that those restrictions were in place for the benefit of Living Essentials.

189.   One of the assets purchased by NSL (including alter egos LD Operating and LD Inc.) was Rock On and the ability, pursuant to the terms of the Agreement, to manufacture Rock On, which at the time did not contain betaine.

190.   In violation of the APA, NSL (including alter egos LD Operating and LD Inc.) has individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced a version of Rock On that contains betaine, which is a Prohibited Ingredient, barred from use by the Agreement.

191.   In violation of the APA, NSL (including alter egos LD Operating and LD Inc.) has individually, collectively, or in concert with one or more person or entity,

directly or indirectly, Produced other Energy Liquids that contain betaine, which is a Prohibited Ingredient barred from use by the Agreement.

192. In violation of the APA, NSL (including alter egos LD Operating and LD Inc.) has individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produced other Energy Liquids that contain Prohibited Ingredients – including but not limited to, choline bitartrate, choline citrate, and alpha glycerylphosphorylcholine – barred from use by the Agreement.

193. By Producing these Energy Liquids, which violate the terms of the Agreement, NSL (including alter egos LD Operating and LD Inc.) is in breach of the APA.

194. As an intended third-party beneficiary of the APA, Living Essentials has the right to enforce the APA and seek remedies for its breach.

195. As a direct result of NSL's (including alter egos LD Operating and LD Inc.) breach of the APA, Living Essentials has suffered damages in excess of $75,000.00, which include, but are not limited to, lost profits and attorneys' fees.

## Count V – Tortious Interference With Contract by NSL (including alter egos LD Operating and LD Inc.)

196. Living Essentials incorporates by reference all of the preceding paragraphs.

197. Plaintiff pleads this count in the alternative and in the event NSL is determined to not be a party to the Agreement.

198.   Living Essentials had an existing contractual relationship with CNL and Jones as a result of the Agreement.

199.   NSL (including alter egos LD Operating and LD Inc.) had knowledge of the Agreement.

200.   NSL (including alter egos LD Operating and LD Inc.) induced CNL and Jones to sell CNL's assets and liabilities to NSL (including alter egos LD Operating and LD Inc.) and, as a result, for CNL and Jones to breach the Agreement by assisting NSL to individually, collectively, or in concert with one or more of them, directly or indirectly, Produce  Energy Liquids that contain the Prohibited Ingredients.

201.   NSL (including alter egos LD Operating and LD Inc.)'s actions were intentional, were taken with malice, and were unjustified in law in order to invade the contractual rights of Living Essentials.

202.   NSL (including alter egos LD Operating and LD Inc.) was unjustified in its instigation of the breach of the Agreement by CNL and Jones.

203.   As a direct result of NSL's (including alter egos LD Operating and LD Inc.) interference with contract, Living Essentials has suffered damages in excess of $75,000.00, which include, but are not limited to, lost profits and attorneys' fees.

## Count VI – Tortious Interference With
## Business Expectancy By NSL (including alter egos LD Operating and LD Inc.)

204.  Living Essentials incorporates by reference all of the preceding paragraphs.

205.   Plaintiff pleads this count in the alternative and in the event NSL is determined to not be a party to the Agreement.

206.   Living Essentials had a valid and legitimate business expectancy that neither CNL nor Jones would individually, collectively, or in concert with one or more of them, directly or indirectly, Produce an Energy Liquid containing a Prohibited Ingredient, or facilitate another party's production, manufacture, distribution, or sale of an energy shot containing a Prohibited Ingredient.

207.   NSL (including alter egos LD Operating and LD Inc.) knew of the Agreement and Living Essentials' business expectancy.

208.   NSL (including alter egos LD Operating and LD Inc.) intentionally acted to induce CNL and Jones to sell CNL's assets and liabilities to NSL (including alter egos LD Operating and LD Inc.) so that NSL (including alter egos LD Operating and LD Inc.) could Produce products that violated Living Essentials' business expectancy.

209.   NSL (including alter egos LD Operating and LD Inc.)'s actions resulted in a breach of the Agreement and interfered with Living Essentials' business expectancy.

210.   As a direct result of NSL's (including alter egos LD Operating and LD Inc.) interference with business expectancy, Living Essentials has suffered damages in excess of $75,000.00, which include, but are not limited to, lost profits and attorneys' fees.

## Count VII – Tortious Interference with Contract by LD Operating and/or LD Inc.

211.   Living Essentials incorporates by reference all of the preceding paragraphs.

212.   Alternatively, and in the event LD Operating, LD Inc. and NSL are determined to be separate and distinct entities, Living Essentials brings this claim.

213.   Living Essentials had an existing contractual relationship with CNL, Jones and NSL as a result of the Agreement and/or the Asset Purchase Agreement.

214.   LD Operating and LD Inc., through Jones and E. Don Lovelace had knowledge of the Agreement.

215.   LD Operating and/or LD Inc. induced Jones, CNL and/or NSL to breach the Agreement by assisting NSL, CNL, and/or Jones to individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produce Energy Liquids that contain the Prohibited Ingredients.

216.   LD Operating and/or LD Inc. induced Jones, CNL and/or NSL to breach the Agreement by assisting Jones, CNL and/or NSL to individually, collectively, or in concert with one or more person or entity, directly or indirectly, violating Section 5.e. of the Agreement.

217.   Each time a separate batch of Energy Liquids containing a Prohibited Ingredient was manufactured constitutes a separate and distinct act of interference on the part of Defendants.

218.   Each separate formulation of an Energy Liquid which formulation included a Prohibited Ingredient constitutes a separate and distinct act of interference on the part of Defendants.

219.   Each time a separate batch of Energy Liquid containing a Prohibited Ingredient was distributed, warehoused, stored, or shipped constitutes a separate and distinct act of interference on the part of Defendants.

220.   Each time CNL, NSL, or Jones advertised, marketed, or promoted an Energy Liquid that contained a Prohibited Ingredient constitutes a separate and distinct act of interference on the part of Defendants.

221.   Each time CNL, NSL, or Jones transferred, bartered, traded, donated, gave away, sold or offered to sell any batch of an Energy Liquid that contained a Prohibited Ingredient constitutes a separate and distinct act of interference on the part of Defendants.

222.   Each time CNL, NSL, or Jones were aware or were notified of any label or advertisement or any other form constituting a violation of Section 5.e. of the Agreement constitutes a separate and distinct act of interference on the part of Defendants.

223.   From the date of the settlement agreement through today, Defendants engaged in multiple independent acts of interference including but not limited those listed above.

224.    LD Operating and LD Inc.'s actions were intentional, were taken with malice, and were unjustified in law in order to invade the contractual rights of Living Essentials.

225.    LD Operating and LD Inc. were unjustified in their instigation of the breach of the Agreement by CNL, Jones and NSL.

226.    As a direct result of LD Operating and LD Inc.'s interference with contract, Living Essentials has suffered damages in excess of $75,000.00, which include, but are not limited to, lost profits and attorneys' fees

### Count VIII – Tortious Interference with Business Expectancy by LD Operating and/or LD Inc.

227.    Living Essentials incorporates by reference all of the preceding paragraphs.

228.    Alternatively, and in the event LD Operating, LD Inc. and NSL are determined to be separate and distinct entities, Living Essentials brings this claim.

229.    Living Essentials had a valid and legitimate business expectancy that neither CNL, Jones nor NSL would individually, collectively, or in concert with one or more person or entity, directly or indirectly, Produce an Energy Liquid containing a Prohibited Ingredient, or facilitate another party's production, manufacture, distribution, or sale of an energy shot containing a Prohibited Ingredient.

230.    LD Operating and LD Inc., through Jones and E. Don Lovelace, knew of the Agreement and Living Essentials' business expectancy.

231.   LD Operating and/or LD Inc. intentionally acted to induce Jones, CNL or NSL to Produce products and make claims or statements that violated Living Essentials' business expectancy.

232.   Each time a separate batch of Energy Liquids containing a Prohibited Ingredient was manufactured constitutes a separate and distinct act of interference on the part of Defendants.

233.   Each separate formulation of an Energy Liquid which formulation included a Prohibited Ingredient constitutes a separate and distinct act of interference on the part of Defendants.

234.   Each time a separate batch of Energy Liquid containing a Prohibited Ingredient was distributed, warehoused, stored, or shipped constitutes a separate and distinct act of interference on the part of Defendants.

235.   Each time CNL, NSL, or Jones advertised, marketed, or promoted an Energy Liquid that contained a Prohibited Ingredient constitutes a separate and distinct act of interference on the part of Defendants.

236.   Each time CNL, NSL, or Jones transferred, bartered, traded, donated, gave away, sold or offered to sell any batch of an Energy Liquid that contained a Prohibited Ingredient constitutes a separate and distinct act of interference on the part of Defendants.

237.   From the date of the settlement agreement through today, Defendants engaged in multiple independent acts of interference including but not limited those listed above.

238.   LD Operating and LD Inc.'s actions resulted in a breach of the Agreement and interfered with Living Essentials' business expectancy.

239.   As a direct result of LD Operating and LD Inc.'s interference with business expectancy, Living Essentials has suffered damages in excess of $75,000.00, which include, but are not limited to, lost profits and attorneys' fees.

## Count IX – Fraudulent Transfer Under the Texas or Michigan Uniform Fraudulent Transfer Acts as to NSL, LD Operating and LD Inc.

240.   Living Essentials incorporates by reference all of the preceding paragraphs.

241.   Alternatively, and in the event LD Operating, LD Inc. and NSL are determined to be separate and distinct entities, Living Essentials brings this claim.

242.   NSL is a debtor, as it is a person who is liable on a claim.

243.   In or around April 2014, NSL transferred to LD Operating or LD Inc. substantially all of its assets including its equipment and the contracts or agreements to produce at least four of the Secret Products, with the actual intent to hinder, delay, or defraud Plaintiff by transferring the assets which are at issue in this case during the course of this case in an effort to avoid liability on the part of NSL.

244.   NSL did not receive a reasonably equivalent value in exchange for the transfers as NSL and LD Operating admit no value was exchanged.

245.   NSL engaged in a transaction in which the remaining of NSL were unreasonably small in relation to the transaction because upon information and belief either no assets or very little assets were left with NSL but were transferred to LD Operating or LD Inc..

246.   E. Don Lovelace is the principal of LD Operating and is a partner therein.

247.   E. Don Lovelace is the principal of LD Inc. and an owner thereof.

248.   E. Don Lovelace is the principal, member, and interest holder in NSL.

249.   Dillon Lovelace is the son of E. Don Lovelace.

250.   Dillon Lovelace is a partner in LD Operating.

251.   Dillon Lovelace is a shareholder in LD Inc.

252.   Dillon Lovelace is an interest holder in NSL.

253.   Patty Lovelace is the wife of E. Don Lovelace.

254.   Patty Lovelace is a partner in LD Operating.

255.   Patty Lovelace is a shareholder in LD Inc.

256.   Patty Lovelace is an interest holder in NSL.

257.   The transfers were to or for the benefit of an insider as E. Don Lovelace is an owner of and the person in control of LD Operating, LD Inc., and NSL and also

because LD Operating, LD Inc. and NSL are also each owned by the son and wife of Mr. Lovelace.

258.   The transfers were concealed.

259.   The principal of NSL and LD Operating, and LD Inc., E. Don Lovelace, are the same and he retained possession or control of the property when the assets were transferred.

260.   Before the transfers were made, NSL had been sued and Case No. 12-13850 had been ongoing for over one year.

261.   The transfers were of substantially all of NSL's assets.

262.   NSL removed assets to LD Operating and/or LD Inc.

263.   NSL was insolvent or became insolvent shortly after the transfers were made.

264.   Living Essentials has suffered damages in excess of $75,000.00 and Plaintiff seeks an order avoiding the transfers; awarding Plaintiff monetary recovery in whatever amount Plaintiff is found to be entitled, plus interest, costs, and reasonable attorneys' fees; and directing Defendants to turn over the amount awarded.

## Count X – Civil Conspiracy as to All Defendants

265.   Living Essentials incorporates by reference all of the preceding paragraphs.

266.   As described herein, Jones, NSL, LD Operating (to the extent it is not an alter ego of NSL), LD Inc. (to the extent it is not an alter ego of NSL), and E. Don Lovelace conspired together to circumvent the Agreement, interfere with the contracts and business relationships of Plaintiff, and fraudulently transfer NSL's assets.

267.   Jones, NSL, and LD Operating (to the extent it is not an alter ego of NSL), LD Inc. (to the extent it is not an alter ego of NSL), and E. Don Lovelace conspired through e-mails, telephone calls, and personal meetings to agree to and understand the manner in which they would accomplish the unlawful objectives set forth herein.

268.   In order to circumvent the Agreement, improperly Produce and sell the Secret Products with the Prohibited Ingredients and avoid liability and obligations to Plaintiff, Jones, NSL, LD Operating (to the extent it is not an alter ego of NSL), LD Inc. (to the extent it is not an alter ego of NSL), and E. Don Lovelace, tortiously interfered with contracts and business expectancies, committed fraudulent transfers, and breached the Agreement and business expectancies, as more fully alleged herein.

269.   Jones, NSL, LD Operating (to the extent it is not an alter ego of NSL), LD Inc. (to the extent it is not an alter ego of NSL) and E. Don Lovelace engaged in concerted actions set forth herein, which were done by one or more persons or entities, to accomplish an unlawful purpose or a lawful purpose by unlawful means.

51

270.   Plaintiff has been damaged, and continues to be damaged, by the civil conspiracy in an amount exceeding $75,000.00 which include, but are not limited to, lost profits and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Living Essentials requests:

A.   That this Court issue a Temporary Restraining Order and Preliminary and Permanent Injunction restraining and enjoining Defendants Custom Nutritional Laboratories, LLC, Nutrition Science Laboratories, LLC, Alan Jones, L.O.D.C., Inc., L.O.D.C. Group, Ltd., and anyone acting in concert with one or more of them from directly or indirectly breaching the Agreement, including but not limited to, individually, collectively, or in concert with one or more persons or entities, directly or indirectly, Producing any Energy Liquid in violation of the Agreement and including but not limited to violating Section 5.e. of the Agreement.

B.   That Defendants Nutrition Science Laboratories, LLC, L.O.D.C., Inc., L.O.D.C. Group, Ltd., and anyone acting in concert with one or more of them return all property of Living Essentials in their possession, custody or control, including all documents identified in § 15 of the Agreement, and all originals and copies of tangible property, proprietary documents, discs, notes, client files, client information, employment information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect

meeting data, proposals, faxes, financial information, pricing, contracts, marketing brochures, marketing database, marketing plans, costs, customer lists, customer information, internal weaknesses, prospect lists, client lists, employee lists, alliance relationships, competitive bid information, client contact lists, sales leads, prospective employee lists, business plans, profit, margin, and forecasting information, strategic planning, project costs, vendor information and contracts, distributors, ingredient suppliers, the Formula, and any other Living Essentials data whether kept in hard copy or electronic form.

C.     That Living Essentials be granted, as relief, money damages, including exemplary and/or punitive damages, lost profits, disgorgement of Defendants' profits, and all other appropriate damages, as well as all interest, costs, and disbursements of this action, including actual attorneys' fees and costs as provided for by the Agreement and under any applicable statute, and such other relief as this Court may deem just and proper.

D.     That Living Essentials be granted, as relief, specific performance of the Agreement.

E.     That the Court avoid the fraudulent transfers alleged herein.

F.     That the Court order the duration of the restrictive covenants in the Agreement be tolled and extended for the duration of the breaches.

G.     All other appropriate legal and equitable relief that this Court deems proper and

just.

<div style="margin-left: 40%;">

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**
Attorneys for Plaintiff

  /s/ *Martha J. Olijnyk*
E. Powell Miller (P39487)
Martha J. Olijnyk (P60191)
950 W. University Dr., Ste. 300
Rochester, MI 48307
(248) 841-2200 phone; (248) 652-2852 fax
mjo@millerlawpc.com

and

**OAKLAND LAW GROUP, PLLC**
Attorneys for Plaintiff

Kevin J. Watts (P64852)
Jessica G. Kingston (P74417)
38955 Hills Tech Drive
Farmington Hills, MI  48331
(248) 536-3282
(248) 871-4062 fax

</div>

Dated:   March 31, 2016

## JURY DEMAND

Plaintiff, Innovation Ventures, LLC f/d/b/a Living Essentials, by and through its

attorneys, hereby demands a trial by jury of the above cause.

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**
Attorneys for Plaintiff

  /s/ *Martha J. Olijnyk*
E. Powell Miller (P39487)
Martha J. Olijnyk (P60191)
950 W. University Dr., Ste. 300
Rochester, MI 48307
(248) 841-2200 phone; (248) 652-2852 fax
mjo@millerlawpc.com

and

**OAKLAND LAW GROUP, PLLC**
Attorneys for Plaintiff

Kevin J. Watts (P64852)
Jessica G. Kingston (P74417)
38955 Hills Tech Drive
Farmington Hills, MI  48331
(248) 536-3282
Dated:   March 31, 2016        (248) 871-4062 fax